FILED

2023 Mar-31  PM 02:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

SONYA HORTON,                    )
                                 )
      Plaintiff,                )
                                 )
  vs.                           )   Case No.  4:21-cv-01651-HNJ
                                 )
SOCIAL SECURITYADMINISTRATION,   )
COMMISSIONER,                    )
                                 )
      Defendant.                )

## MEMORANDUM OPINION

Plaintiff Sonya Horton seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability, disability insurance benefits, and supplemental security income benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 11).

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).  To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far.  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at §§ 404.1520(c), 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00-114.02.  *Id.* at §§ 404.1520(d), 416.920(d).  If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would

2

prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. §§ 404.1512(b)(3), 416.912(b)(3), 404.1520(g), 416.920(g). If the claimant can

perform other work, the evaluator will not find the claimant disabled. *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. . . . Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the evidence

preponderates against the Commissioner's decision.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Horton, age 28 on the date of the administrate hearing, filed an application for a period of disability, disability insurance, and supplemental security income benefits on March 18, 2013, originally alleging disability as of October 14, 2012.  (Tr. 29, 197-211). On September 11, 2013, the Commissioner denied Horton's administrative claim.  (Tr. 94-103).  Horton timely filed a request for a hearing on October 15, 2013.  (Tr. 108-09).  Horton also amended her disability onset date to April 1, 2014.  (Tr. 29).

An Administrative Law Judge ("ALJ") held a hearing on April 15, 2015, and he issued an opinion on May 14, 2015, denying Horton's claim.  (Tr. 26-43).  This court reversed and remanded the ALJ's decision on March 20, 2018.  (Tr. 941-44, 947-69). On remand, another ALJ held a hearing on October 30, 2019, and she issued an opinion on December 19, 2019, denying Horton's claim.  (Tr. 970-97).  The Appeals Council remanded that ALJ's decision on November 16, 2020.  (Tr. 998-1104).  On the second remand, the ALJ held a hearing on April 21, 2021, and she issued an opinion on May 7, 2021, again denying Horton's claim.  (Tr. 800-824).

Applying the five-step sequential process, the ALJ found at step one that Horton did not engage in substantial gainful activity since April 1, 2014, the alleged onset date. (Tr. 806).  At step two, the ALJ found Horton manifested the severe impairments of degenerative disc disease of the cervical spine status post fusion at C6-7, degenerative

changes of the lumbar spine, obesity, depression, and anxiety.  (*Id.*).  At step three, the ALJ found that Horton's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 807).

Next, the ALJ found Horton exhibited the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can never climb ladders, ropes or scaffolds and can have no exposure to excessive vibration, unprotected heights, or hazardous machinery.  The claimant is limited to simple, routine, repetitive tasks consistent with unskilled work with the ability to concentrate and attend for two-hour periods.  The claimant can do work that is goal-oriented but is precluded from assembly line pace work.  Contact with the general public does not need to be an essential part of the job duties.  The claimant can have work that is around coworkers throughout the day but can have only occasional interaction with coworkers. The claimant requires a sit/stand option at thirty minute intervals, where the claimant can sit for one to thirty minutes followed by standing for one to thirty minutes but would not be away from her workstation or off task as a result of the position change.

(Tr. 809).

At step four, the ALJ determined Horton had no past relevant work.  (Tr. 813). At step five, the ALJ determined Horton could perform a significant number of other jobs in the national economy considering her age, education, work experience, and RFC. (Tr. 814).  Accordingly, the ALJ determined Horton has not suffered a disability, as defined by the Social Security Act, since April 1, 2014.  (Tr. 815).

Horton timely requested review of the ALJ's decision.  (Tr. 792).  On November 23, 2021, the Appeals Council denied review, which deems the ALJ's decision as the

Commissioner's final decision. (Tr. 792-99). On December 14, 2021, Horton filed her complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

In this appeal, Horton argues the ALJ improperly considered various medical opinions. Specifically, Horton contends the ALJ improperly considered the opinion of Muhammad Tariq, M.D. (treating physician), Jewel Brennan, M.D. (consulting psychologist), June Nichols, M.D. (examining psychologist), Jay Ripka, M.D. (examining physician), and Anand Iyer, M.D. (examining physician). The ALJ clearly and thoroughly articulated her reasons for assigning little weight to the various medical opinions; she relied on permissible considerations; and her findings enjoy substantial evidentiary support. Therefore, Horton's contentions lack merit because the ALJ articulated good cause for assigning little weight to all of the challenged medical assessments, and substantial evidence supports the ALJ's decision.

*Dr. Brennan*

Horton asserts several argues regarding the testimony of Dr. Brennan, particularly in her reply brief. None of the contentions regarding Dr. Brennan's testimony warrant reversal.

First, Horton argues the ALJ "failed to consider Listing 12.08 and 12.15, even after identified by Dr. Brennan." (Doc. 21 at 4). An ALJ's failure to discuss specific listings "does not necessarily show that the ALJ did not consider those listings." *Flemming v. Comm'r of the Soc. Sec. Admin.*, 635 F. App'x 673, 676 (11th Cir. 2015). "While

the ALJ is required to consider the Listing of Impairments in making a decision at step three, [the Eleventh Circuit] do[es] not require an ALJ to 'mechanically recite' the evidence or listings she has considered." *Id.* (quoting *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986)). "There may be an implied finding that a claimant does not meet a listing." *Id.* (internal quotation marks omitted) (quoting *Hutchison*, 787 F.2d at 1463). "Therefore, in the absence of an explicit determination, [a court] may infer from the record that the ALJ implicitly considered and found that a claimant's disability did not meet a listing." *Id.* (citing *Hutchison*, 787 F.2d at 1463).

The ALJ generally maintained Horton "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 807). In addition, the ALJ discussed the reasons she accorded little weight to Dr. Brennan's opinion that Horton satisfied "paragraph B" of Listings 12.04 (depressive, bipolar and related disorders), 12.08 (personality and impulse-control disorders), and 12.15 (trauma- and stressor-related disorders). (Tr. 813).

Most importantly, the ALJ specifically determined Horton did not meet the "paragraph B" criteria for Listings 12.04 and 12.06. (Tr. 808). Under "paragraph B" for Listings 12.04 and 12.06, a claimant must exhibit an

[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning . . . :

1. Understand, remember, or apply information . . . .

8

    2.  Interact with others . . . .

    3.  Concentrate, persist, or maintain pace . . . .

    4.  Adapt or manage oneself . . . .

20 C.F.R. § Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06.

The same criteria apply equally to Listings 12.08 and 12.15. *See id.* at §§ 12.08, 12.15. All four listings—12.04, 12.06, 12.08, 12.15—require a claimant to satisfy the same paragraph B criteria, "which concerns functional limitations caused by the mental impairment, despite requiring differing qualifying symptoms." *Flemming*, 635 F. App'x at 677.[2] Given the foregoing review, the court finds the ALJ implicitly determined Horton did not satisfy Listings 12.08 and 12.15.

As an additional assignment of error, Horton argues the ALJ gave improper weight to Dr. Brennan's opinion. (Doc. 21 at 5). As recounted, Dr. Brennan opined

---

[2] Listings 12.04, 12.06, 12.15 also provide an alternative way for a claimant to establish a disability. This alternative showing, pursuant to "paragraph C," requires the claimant to demonstrate

    a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

    1.  Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

    2.  Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. § Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06, 12.15. Horton does not contend she satisfies the paragraph C criteria. Moreover, the ALJ determined Horton did not meet the paragraph C criteria for Listings 12.04 and 12.06. (Tr. 808-09).

during the hearing that Horton met Listings 12.04, 12.08, and 12.15, and satisfied "paragraph B" of those Listings.  (Tr. 916-20).

Pursuant to prior regulations, "there are three types 'of medical opinion sources: (1) treating physicians; (2) nontreating, examining physicians; and (3) nontreating, nonexamining physicians.'" *Stinson v. Kijakazi*, 565 F. Supp. 3d 1219, 1226 (M.D. Ala. 2021) (quoting *Himes v. Comm'r of Soc. Sec.*, 585 F. App'x 758, 762 (11ᵗʰ Cir. 2014)).

> A treating physician is an acceptable medical source who provides (or has provided) a claimant with medical treatment and has (or has had) an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.927(a)(2). A nontreating, examining physician is an acceptable medical source whose relationship with a claimant is based solely on the claimant's need to obtain a report in support of his disability claim. *Id.* A nontreating, nonexamining physician is an acceptable medical source who has not examined a claimant, but has reviewed the claimant's medical record and has an understanding of the applicable disability regulations. 20 C.F.R. § 416.927(c).

*Id.*

"Generally, the opinions of treating physicians are given more weight than those of nontreating physicians, and the opinions of examining physicians are given more weight than those of nonexamining physicians." *Id.* (citing *Flowers v. Comm'r of Soc. Sec.*, 441 F. App'x 735, 740 (11ᵗʰ Cir. 2011)); *see also Fleming v. Comm'r, Soc. Sec. Admin.*, 550 F. App'x 738, 739 (11ᵗʰ Cir. 2013) ("The opinions of treating physicians generally are given more weight than the opinions of non-treating physicians." (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11ᵗʰ Cir. 1997)).

To determine the weight due a medical opinion, an ALJ must consider several

factors, including the examining relationship, the treatment relationship, the evidence presented to support the opinion, the consistency of the opinion with other evidence, and the specialization of the medical professional.  20 C.F.R. § 404.1527(c); *see Davis v. Comm'r of Soc. Sec.*, 449 F. App'x 828, 832 (11th Cir. 2011) (stating an ALJ generally will give more weight to the medical opinions of a source who has examined the plaintiff and opinions that are supported by medical signs and findings and are consistent with the overall "record as a whole").  The ALJ may reject the opinion of any physician when evidence supports a contrary conclusion.  *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (citing *Bloodsworth*, 703 F.2d at 1240); *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987) ("Of course, the ALJ may reject any medical opinion if the evidence supports a contrary finding." (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir.1985)).  However, the ALJ must "state with at least some measure of clarity the grounds for [a] decision."  *Winschel*, 631 F.3d at 1179.  This measure of clarity requires the ALJ to state the weight given to each medical opinion and the reason therefor.  *Id.*

In the case at bar, Dr. Brennan constitutes a nontreating, nonexamining physician, and therefore, at the outset, her opinion does not command great weight. *See Sober v. Comm'r, Soc. Sec. Admin.*, 841 F. App'x 109, 112 (11th Cir. 2020) ("We have previously held in *Crawford v. Comm'r of Soc. Sec.* that a one-time examining psychologist's opinion 'was not entitled to great weight.' 363 F.3d 1155, 1160 (11th Cir. 2004).").

In her opinion, the ALJ stated the weight she gave to Dr. Brennan's opinion and articulated why she discounted it:

> The undersigned considered the opinion of Dr. Jewel Brennan who testified in the hearing in October 2019 and finds it to be of little weight (Exhibit 34F and Hearing Testimony). The undersigned finds the opinion is inconsistent with the record and overly relies on the claimant's subjective complaints and reported history of behavior. Dr. Brennan made assumptions about the claimant's treating records and relied on subjective complaints for the claimant meet [sic] the various B criteria of the listings. The testimony is not supported by the actual evidence of record as Dr. Brennan testified the claimant has a personality disorder or PTSD, but there is no diagnosis of either impairment in her general treatment records or her mental health records. Dr. Brennan based her opinion that the claimant met listings 12.04, 12.08, and 12.15 based on the claimant's no-show appointments, assumed inability to apply information based on her no-shows, and on her staying in abusive relationships (Hearing Testimony). Dr. Brennan did not cite to or support her opinion with multiple or longitudinal objective examination findings and explained that she based her opinion on her own subjective experience of hospitals. Dr. Brennan discounted the examiner's normal findings using her own experience of hospitals and her belief that the claimant could not get good treatment with a lack of insurance (Hearing Testimony). Her opinion is not supported by the claimant's multiple records with normal psychiatric findings.

(Tr. 813).

Substantial evidence supports the ALJ's finding. On May 6, 2014, Gadsden Regional Medical Center ("Gadsden") chronicled that Horton appeared alert and exhibited normal orientation. (Tr. 637). Between September 30, 2014, and July 7, 2016, Quality of Life depicted Horton with normal orientation and memory, and an appropriate mood and affect. (Tr. 649, 655, 1814, 1819, 1824, 1828, 1834, 1839). On March 25, 2016, Riverview Regional Medical Center ("Riverview") documented Horton

with a normal mood and affect, normal behavior, and normal judgment. (Tr. 1683). On September 22, 2016, visit at Riverview, Horton denied manifesting psychiatric or behavioral issues, and she exhibited a normal mood and affect with normal behavior. (Tr. 1687-88).

On March 27, 2017, Riverview reported Horton with a normal mood and affect. (Tr. 1690). On an August 22, 2017, visit at Riverview, Horton denied experiencing psychiatric or behavioral issues, and she conveyed a normal mood and affect with normal behavior and thought content. (Tr. 1693).

Later that year on October 16, 2017, Gadsden admitted Horton because she presented with suicidal ideations and depression. (Tr. 1754, 1757, 1762, 1774). During a psychiatric exam, Horton appeared cooperative with normal judgment, but she exhibited a depressed, tearful, and flat mood and affect. (Tr. 1756).

During a mental status examination on October 17, 2017, at Gadsden, Horton appeared slightly withdrawn but cooperative, and she exhibited normal speech volume, rate, and tone; anxious and depressed mood; constricted affect; goal directed thought process; denial of suicidal or homicidal thoughts and hallucinations; orientations to person, place, and time; intact recent and remote memory; and fair insight and judgment. (Tr. 1761). Gadsden diagnosed Horton with moderate-to-severe major depressive disorder. (Tr. 1762). On October 18, 2017, Gadsden reported Horton appeared cooperative with a normal mood, affect, and cognition, and she appeared alert and oriented. (Tr. 1767, 1771).

Gadsden discharged Horton on October 21, 2017. (Tr. 1742, 1774). At discharge, despite a slight psychomotor retardation, Horton appeared pleasant and cooperative, with normal speech, a good/bright mood and affect, a goal directed thought process, normal cognition, intact recent and remote memory, and fair insight and judgement. (Tr. 1775). Horton also received a major depression diagnosis at discharge. (Tr. 1776).

On November 8, 2017, CED Mental Health Center ("CED") documented Horton exhibited a euthymic mood, a normal affect, and orientation to person, place, time, and situation. (Tr. 1741). CED diagnosed Horton with "[major depressive disorder], Recurrent, Severe [with] psych[otic] sym[ptoms]" and recommended "AOP" therapy. (Tr. 1753).

On January 25, 2018, Horton presented with depressive/mood disorder at Aletheia House upon admission for substance abuse treatment. (Tr. 1966). During a mental status examination, Horton exhibited a mildly impaired remote memory, along with normal orientation, an appropriate mood and affect, normal speech, intact immediate and recent memory, a relevant and coherent thought process, normal thought content, and partial judgment and insight. (Tr. 1969). Alethia House documented Horton's diagnosis of depression and anxiety. (Tr. 1972). On February 1, 2018, Aletheia House admitted Horton for in-patient treatment for stimulant use disorder. (Tr. 1974).

On February 11, 2018, UAB Medicine reported Horton appeared cooperative

with an appropriate mood and affect.  (Tr. 1720).  On February 20, 2018, Aletheia House's records reflect Horton taking medications for depression, but not anxiety, and manifesting suicidal thoughts and depression back in October 2017.  (Tr. 1968). Between April 20, 2018, to May 10, 2018, Horton reported to UAB Medicine she did not experience anxiety or depression symptoms and appeared cooperative, alert, and oriented.  (Tr. 1923-24, 1926, 1929, 1931, 1933)

On May 30, 2018, Alethia Housed found Horton completed her course of treatment and discharged her.  (Tr. 1974).  The discharge paperwork stated, in relevant part,

> [Horton] is diagnosed with depression and anxiety. She also reports not experiencing any form of A/V hallucinations to include feeling things that are not present. [Horton] has been able to work through negative thoughts that led her to using crack cocaine.

(*Id.*).  The Alethia House also generated a clinical staffing report for after care plan which stated,

> [Horton] is presently diagnosed with depression and anxiety. [Horton] has been able to successfully comply with prescribed medications to aide with mental health conditions. [Horton] reports no SH ideations while in inpatient treatment.

(Tr. 1976).

On August 13, 2018, CED documented Horton exhibited a euthymic mood, a normal affect, and orientation to person, place, time, and situation.  (Tr. 1740).  On October 11, 2018, CED found Horton demonstrated decreased memory, concentration, attention, and judgment.  (Tr. 1737).  Yet, she also exhibited cooperative

and engageable behavior, normal speech, a euthymic mood, an appropriate affect, a goal directed thought process, and orientation to person, place, and time.  (*Id.*).  Horton also reported no suicidal, homicidal, paranoid, delusional, or hallucinatory thoughts.  (*Id.*).

On October 24, 2018, Gadsden reported Horton appeared cooperative with an appropriate mood and affect, with normal judgment.  (Tr. 1783).  On November 18, 2018, during an emergency room visit to Riverview, Horton appeared alert and orientated to person, place, and time.  (Tr. 1794-95).

On January 17, 2019, Quality of Life commented Horton portrayed normal orientation and an appropriate mood and affect.  (Tr. 1846).  On March 1, 2019, CED reported Horton displayed a euthymic mood, a normal affect, and orientation to person, place, time, and situation.  (Tr. 1935).  Furthermore, Horton reported no suicidal or homicidal thoughts.  (*Id.*).  On July 3, 2019, Gadsden commented Horton appeared cooperative with an appropriate mood and affect, and normal judgment.  (Tr. 1950).

On September 20, 2019, Horton complained to Huma Khusro, M.D., at CED that she felt depressed and stressed.  (Tr. 2251).  During a mental exam, Dr. Khusro chronicled Horton exhibited a dysphoric mood, and limited insight and judgment.  (Tr. 1958, 2250).  However, Horton also reflected an appropriate appearance, cooperative behavior, appropriate speech, an appropriate affect, normal thought content and process, normal orientation, normal memory, normal intellectual function, average intelligence, and no observable or reportable hallucinations, or self-abusive, suicidal, or aggressive thoughts.  (*Id.*).  In addition, Horton commented that though she did not

16

have a job, she sought employment.  (Tr. 1959, 2251).

On a record dated December 16, 2019, CED conveyed that Horton portrayed a euthymic mood, an appropriate affect, and orientation to person, place, time, and situation.  (Tr. 2150).  Horton also reported no suicidal or homicidal ideations.  (*Id.*).

On a record dated December 17, 2019, Horton complained to CED about feeling depressed and very anxious.  (Tr. 2148).  She explained her Zoloft prescription dosage did not help much, and she relayed feeling irritable and easily agitated at times. (*Id.*).  Horton discussed having anger outburst at times out of nowhere, in which she yelled and threw things.  (*Id.*).  She also recounted having flashbacks and intrusive thoughts of past trauma.  (*Id.*).  During a mental exam, Horton exhibited limited insight and judgment, however.  (Tr. 2147).  Nevertheless, she demonstrated cooperative behavior, appropriate speech, a dysphoric mood, an appropriate affect, normal thought content and thought process, normal intellectual function, average intelligence, normal orientation, and normal memory.  (*Id.*).  She did not have any observable or reportable self-abusive, suicidal, or aggressive thoughts.  (*Id.*).  And although Horton reported auditory and visual hallucinations, she did not appear to respond to internal stimuli. (Tr. 2147-48).  Horton again commented she sought employment at that time.  (Tr. 2151).  The nurse practitioner, Judith Morris, diagnosed Horton with dysthymia,[3] a

---

[3] "Dysthymia is a milder, but long-lasting form of depression. It's also called persistent depressive disorder. People with this condition may also have bouts of major depression at times."  John's Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/dysthymia (last visited Mar. 31, 2023).

history of substance abuse, and rule-out of PTSD.  (Tr. 2148).

On February 2, 2020, (consultative examining psychologist) Dr. Nichols stated Horton's "[s]peech was clear and normal in rate," "[e]ye contact was fair," "[m]ood was within normal limits and congruent with thought process," and "[a]ffect was sad, but appropriate."  (Tr. 2130).  Dr. Nichols further determined Horton's "[s]tream of consciousness was clear" and appeared "oriented to person, place, time, and situation." (*Id.*).  Horton also maintained a grossly intact memory function, an adequate general fund of knowledge, and a normal thought process. (Tr. 2131).  As relevant, Dr. Nichols diagnosed Horton with major depressive disorder, recurrent, severe with psychotic features; panic disorder; alcohol use disorder, reported in remission; cocaine use disorder, reported in remission; and borderline to mild intellectual disabilities.  (Tr. 2132).

At CED on a record dated June 16, 2020, Horton complained of experiencing depression symptoms, trouble sleeping, and anxiety.  (Tr. 2142).  She also explained suffering some memory loss, yet she did not know if medication or past head trauma caused that symptom.  (*Id.*).  CED detailed that Horton displayed cooperative behavior, slowed speech, a dysphoric mood, a flat affect, a normal thought process, normal intellectual functioning, average intelligence, normal orientation, normal memory, and normal judgment.  (Tr. 2145).  Horton did not appear to experience hallucinations or delusions, self-abusive thoughts, suicidal thoughts, or aggressive thoughts.  (*Id.*).  CED commented that Horton made a past attempt to either harm herself or others.  (*Id.*).

18

On a record dated July 30, 2020, CED specified that Horton reflected an appropriate appearance and demonstrated cooperative behavior, appropriate speech, a euthymic mood, an appropriate affect, normal thought content and thought process, normal intellectual function, average intelligence, normal orientation, normal memory, fair insight, and fair judgment.  (Tr. 2137).  Horton also exhibited no observable or reported hallucinations, self-abusive thoughts, suicidal thoughts, or aggressive thoughts.  (*Id*.).  She stated she "still gets anxious" ("lots of that"), "overly anxious because there [was] so much going on," and irritable at time, yet Zoloft helped with the depression and minimally with anxiety.  (Tr. 2138).  Horton reported "doing pretty good," and she relayed her medication helps keep her calm and "she does ok" as long as she stays on her medication.  (Tr. 2138).

At a July 31, 2020, dated therapy session at CED with therapist Chardonney Johnson, Horton reported she experienced "some anxiety, along with depressive symptoms," and in a section entitled "Problem/Need" with a start date of "6/16/2020," the CED record chronicles Horton as reporting "visual hallucinations, depressed mood, loss of interest, suicidal ideations, anxiety, sad thoughts, fatigue, insomnia, isolation," and "continued persistent depressive symptoms [dysthymia]." (Tr. 2134-35).  CED remarked that Horton demonstrated a euthymic mood, an appropriate affect, and orientation to person, place, time, and situation.  (Tr. 2133). Furthermore, Horton reported no suicidal or homicidal thoughts.  (*Id*.).  Horton also reported doing "okay," and she denied experiencing any overwhelming anxiety or

19

depressive symptoms, despite the occurrence of such symptoms approximately two to four days per week.  (Tr. 2134).

In addition, the therapist reports the following information at that same July 31, 2020, dated session at CED:

> Recipient [Horton] reports that she has BCBS insurance and she will look into the mental health services provided by her insurance.  She verbalized understanding as therapist explained that CED provides services to severely mentally ill population and recipient no longer meets criteria.

(Tr. 2134).

The foregoing records serve as substantial evidence supporting the ALJ's determination to give little weight to Dr. Brennan's opinion, particularly the diagnostic and examination findings within those records.[4]

Horton also argues the ALJ failed "to discuss Brennan's opinion in the context of Horton's inability to (a) concentrate, persist, or maintain pace; and (b) adapt or manage herself."  (Doc. 21 at 7).  That is, Horton argues the ALJ failed to consider all

---

[4] The CED records portray Horton may have succeeded with a request for a closed period of disability:

> "A claimant may request benefits for a finite period of disability, even if she is later able to work. In such 'closed period' cases, 'the decision maker determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision.'" *Mitchell v. Comm'r of Soc. Sec.*, 393 Fed. Appx. 651, 652 (11th Cir. 2010) (quoting *Pickett v. Bowen*, 833 F.2d 288, 289 n.1 (11th Cir. 1987)). A claimant may raise the issue of a closed period of disability on appeal if the claimant has specified the dates that define the closed period for which benefits are sought. *Jones v. Comm'r of Soc. Sec.*, 181 Fed. Appx. 767, 772-73 (11th Cir. 2006).

*Sandlin v. Colvin*, No. 5:14-CV-1885-MHH, 2016 WL 4820785, at *3 (N.D. Ala. Sept. 14, 2016). However, Horton did not request a closed period of disability, or relatedly, specify the dates of such period, during the administrative proceedings or on this appeal, so the court considers the issue no further.

of the "paragraph B" criteria vis-à-vis Dr. Brennan's opinions.   The court finds no reason for error.  As recounted previously, the ALJ assessed all of the "paragraph B" criteria, and her accordance of little weight to Dr. Brennan's opinion forestalls the consideration of her opinion vis-à-vis the "paragraph B" assessment.

Horton further contends the ALJ failed "to consider the effects of [her] poverty on her medical records." (Doc. 21 at 7).  More pointedly, Horton asserts the ALJ effectively faulted her for a lack of treatment for her mental health ailments, purportedly evidenced by the ALJ's failure to "examine whether Horton was receiving the treatment she needed at CED Mental Health Center as Dr. Brennan implied." (*Id.* at 8).  Horton concludes a lack of access to health care, caused by the lack of health insurance, caused a "lack of treatment records" in the CED medical records.  (*Id.* at 9).  This lack of treatment records led to the ALJ discrediting (1) Horton's subjective pain testimony, and (2) Dr. Brennan's opinion "based on her attempt to explain that lack of health insurance was muddling the record of Horton's impairments." (*Id.* at 10).  Horton asserts this discrediting amounts to an error of law.[5]

---

[5] The Eleventh Circuit maintains an oft-cited pain standard:

> A three-part "pain standard" applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. [*Wilson* v. *Barnhart*, 284 F.3d 1219, 1225 (11ᵗʰ Cir. 2002)]. The pain standard requires evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged pain arising from that condition or a showing that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11ᵗʰ Cir. 2021).  A claimant's testimony

As Horton correctly observed, an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering . . . information in the case record, that may explain [the] failure to seek medical treatment [including] [t]he individual['s ability] to afford treatment and . . . access to free or low-cost medical services." SSR 96-7p, 1996 WL 374186, *7-8 (July 2, 1996).   The record portrays the ALJ did not violate this legal principle.

The ALJ discerned Horton's records "show no treatment for her mental impairments until November 2017 when the claimant was diagnosed with major depressive disorder, severe, with psychosis after a brief hospitalization in October 2017 for suicidal ideation." (Tr. 811).   Subsequent to October 2017, however, Horton

---

coupled with evidence that meets this standard suffice "to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted); *see also Hollingsworth v. Comm'r of Soc. Sec.*, 846 F. App'x 749, 752 (11th Cir. 2021).

Social Security Ruling ("SSR") 16-3p mandates an ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2016 WL 1119029, *7 (Mar. 16, 2016).  An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4), 416.929(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." 2016 WL 1119029 at *9; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

obtained mental health treatment, as reviewed in detail previously.  Those mental health records served as substantial evidence for the ALJ's findings regarding the pain standard as well as her assessing little weight to Dr. Brennan's opinions.

Based upon the presence of those records, the ALJ did not fault Horton for a failure to follow prescribed treatment, as she actually obtained mental health treatment from CED and the ALJ reviewed those records.  Horton's argument actually amounts to a different critique:  the ALJ failed to conclude that Horton's lack of health insurance led to her obtaining inadequate mental health care from CED.  The prevailing legal principles do not require the ALJ to foster such a conclusion.  *C.f., Hand v. Soc. Sec. Admin., Comm'r*, 786 F. App'x 220, 224 (11th Cir. 2019) (An "ALJ generally may not substitute his or her own opinion on medical issues for that of the medical experts." (citing *Graham v. Bowen*, 786 F.2d 1113, 1115 (11th Cir. 1986); *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982))).  Social Security disability law tasks the ALJ with reviewing the medical records on file and determining whether objective evidence in those records supports Horton's claim, not with generally critiquing the mental health treatment Horton received.  Thus, the ALJ did not "effectively fault[ ] Horton for the treatment she did not receive."  (Doc. 21 at 8).[6]

---

[6] Relatedly, Horton contends the ALJ discredited certain subjective pain complaints -- particularly hand pain and numbness, and headaches -- based on the lack of treatment for those purported ailments.  (*Id.* at 9).  As a principal matter, the ALJ did not solely rely upon the lack of medical treatment to discount Horton's subjective complaints regarding hand pain and numbness, and headaches.  Regarding the hand pain and numbness, the ALJ recounted that "[o]n examination in 2013, [Horton exhibited] 5/5 grip strength and full range of motion in her hands and wrists"; furthermore, on July 8, 2015, she only demonstrated "some weakness in her grasp during an evaluation

Along the same lines, Horton correctly observes that an ALJ cannot discredit a claimant's subjective complaints based solely on a lack of objective medical evidence. *Snyder v. Comm'r of Soc. Sec.*, 330 F. App'x 843, 848 (11th Cir. 2009) (citing 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2)).   However, this error arises when an ALJ fails to "point to any objective medical evidence contradicting [a claimant's] pain allegations . . . ." *Id.* In the case at bar, the ALJ did not rule against Horton based upon a lack of objective evidence supporting the alleged symptoms.   Rather, the ALJ reviewed the objective medical evidence and determined it contradicted Horton's alleged mental health symptoms.   Therefore, the ALJ did not err in this regard.

In conclusion, Horton's argument fails because substantial evidence supports the ALJ's decision to assign little weight to Dr. Brennan's assessment.

---

by Dr. Ripka," yet Dr. Ripka "did not provide any specific rating based on his evaluation."  (Tr. 807).

As for Horton's complaints of headaches, the ALJ explained that under SSR 19-4p,

> a migraine headache cannot be established on the basis of a diagnosis of a statement of symptoms but instead the evidence must document that an acceptable medical source made the diagnosis after reviewing the person's medical history, conducting a physical examination, and who made the diagnosis of a primary headache disorder only after excluding alternative medical and psychiatric causes of the person's symptoms. In addition, the treatment notes must be consistent with a diagnosis of primary headache disorder.

(*Id.*).

The record contains, as the ALJ correctly noted, "no observation of a typical headache event or . . . detailed descriptions of the event including all associated phenomena, by an acceptable medical source, no laboratory testing, or no evidence in the file from an acceptable medical source documenting ongoing headaches that persist despite treatment."  (*Id.*).  Hence, the ALJ did not discredit Horton's subjective complaints of headaches; rather, she concluded Horton's "migraine headaches are not a medically determinable impairment under Social Security Ruling 19-4p."  (*Id.*).

*Dr. Tariq*

Horton contends the ALJ improperly considered the opinion of Muhammad Tariq, M.D., a treating physician for Horton, by according it little weight.  The ALJ did not err in this regard.

On February 10, 2015, Dr. Tariq completed a Physical Capacities form finding Horton could only sit one hour, stand less than 30 minutes, and walk less than 30 minutes at a time; and she would need to lie down, sleep, or sit with her legs elevated one hour of the day.  (Tr. 643).  Dr. Tariq cited neck and back pain as causes for Horton's limitations.  (*Id.*).  Because Horton applied for benefits before March 27, 2017, the treating physician rule applies to this case.  *Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 896-97 (11ᵗʰ Cir. 2022) (explaining that before March 27, 2017, administrative law judges had to adhere to the treating physician rule).

The ALJ must give "substantial or considerable weight" to the opinion of a treating physician "unless 'good cause' is shown."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11ᵗʰ Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436 1440 (11ᵗʰ Cir. 1997)), *superseded on other grounds by* 20 C.F.R. § 404.1520c.  Good cause exists when: (1) the evidence did not bolster the treating physician's opinion; (2) the evidence supported a contrary finding; or (3) a treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Id.* at 1240-41.  An ALJ must clearly articulate the reasons for affording less weight to a treating physician's opinions.  *Id.* at 1241.  An ALJ does not commit reversible error when (1) she articulates specific reasons for

declining to give the treating physician's opinion controlling weight, and (2) substantial evidence supports these findings. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (*per curiam*).

> In her opinion, the ALJ determined,
>
> The undersigned has considered the opinion of Dr. Muhammad Tariq provided in February 2015 and finds it to be of little weight . . . . As noted above, Dr. Tariq's examinations have been largely normal with only some muscle spasm noted, but Dr. Tariq opined the claimant could only sit one hour and could stand and walk less than thirty minutes, and this opinion was based on her impairments of "neck and back pain." His opinion is also not consistent with the other examinations in the record that were also largely normal. Thus, his opinion is given little weight.

(Tr. 812).

The ALJ concluded Dr. Tariq imposed a greater degree of limitation than the record supported, and Dr. Tariq's opinions contradicted his own objective findings. (Tr. 812). On September 30, 2014, Dr. Tariq chronicled Horton suffered muscle spasms in her cervical, thoracic, and lumbar spine, and assessed Horton with chronic lumbago and cervicalgia. (Tr. 649). Dr. Tariq prescribed Horton diclofenac sodium and Flexeril, and recommended Horton engage in back exercises. (*Id.*). Horton also underwent an x-ray of her cervical spine which showed a prior fusion at C-6 and mild degenerative disc disease at C-5. (Tr. 662).[7]

---

[7] On July 26, 2006, Horton experienced a motor vehicle accident which resulted in a facet fracture and traumatic grade 1 spondylolisthesis at C6-7. (Tr. 364, 409, 413, 425, 430, 432, 439, 482, 554, 829, 843). On July 31, 2006, Horton underwent an open reduction and internal fixation with Danek atlas cable wiring and allograft fusing at Gadsden Regional Medical Center ("Gadsden"). (Tr. 364, 432). Gadsden discharged Horton on August 4, 2006. (Tr. 439-40). On September 18, 2006, Horton underwent another open reduction and internal fixation of C6-7 at Gadsden after the first one failed. (Tr. 453,

On November 10, 2014, Dr. Tariq noted Horton suffered muscle spasms in her cervical and lumbar spine, and assessed Horton with chronic cervicalgia, lumbago, and degenerative disc disease.  (Tr. 653, 655).  Dr. Tariq prescribed Horton diclofenac sodium, Flexeril, and Neurontin, and recommended Horton engage in back exercises. (Tr. 653, 655).  On February 10, 2015, Dr. Tariq reported Horton suffered both muscle spasms and a mildly reduced range of motion in her cervical and lumbar spine.  (Tr. 660).  Dr. Tariq assessed Horton with chronic cervicalgia and lumbago, prescribed her diclofenac sodium, Flexeril, and Neurontin, and recommended she engage in neck and back exercises.  (Tr. 658, 660).  On April 6, 2015, during a physical exam, Dr. Tariq mentioned Horton exhibited a mildly reduced range of motion in her lumbar spine. (Tr. 668).  On January 1, 2016, Dr. Tariq reported Horton having no decreased mobility in her musculoskeletal system.  (Tr. 1813).

Moreover, the record supports the ALJ's conclusion that other examinations conflicted with Dr. Tariq's opinion.  During an August 31, 2013, physical exam, Dr. Iyer noted Horton portrayed no difficulty getting on and off an exam table, a normal gait, no need for an assistive device for ambulation, could walk on her heels and tiptoes, could squat, and exhibited a full range of motion in her shoulders, back, hips, and knees.

---

489).  Gadsden discharged Horton on September 21, 2006.  (Tr. 458, 494).

In October 2012, Horton experienced a second motor vehicle accident which she asserts exacerbated her neck pain, yet a radiographic examination performed by Gadsden showed no acute bone injury in her cervical spine.  (Tr. 375, 510, 554, 829, 844).  Gadsden also performed a radiographic examination of Horton's lumbar spine which portrayed partial sacralization of L5 with concurrent congenital spina bifida occulta but no acute bone pathology.  (Tr. 511).

(Tr. 555).  Dr. Iyer concluded Horton "does not have significant limitation of functions involving: sitting, hearing, walking, standing, handling, and speaking."  (Tr. 555).  On July 15, 2015, Dr. Ripka performed a physical examination on Horton and commented Horton displayed good strength in her lower extremities and straight leg raising test. (*Id.*).

On January 20, 2016, Horton reported to Quality of Life Health Services she experienced muscle spasms in her cervical and lumbar spine, but Flexeril and Neurontin helped with Horton's neck and back pain.  (Tr. 1816, 1819).  Horton received a recommendation to engage in back exercises and to continue taking her cyclobenzaprine, Neurontin, and Ultram prescriptions.  (Tr. 1819-20).

On April 20, 2018, UAB Hospital's ("UAB") record shows Horton exhibited no musculoskeletal pain and a normal range of motion.  (Tr. 1931-33).  On May 4, 2018, UAB reported that Horton ambulated without difficulty, and a normal range of motion and strength.  (Tr. 1926-29).  On May 10, 2018, Horton exhibited at UAB she had no neck pain and a normal gait.  (Tr. 1923-24).

On July 3, 2019, Gadsden Regional Medical Center noted that Horton demonstrated a normal range of motion, normal strength, no tenderness, and no swelling.  (Tr. 1950).  She also underwent a CT scan of her cervical spine.  (Tr. 1945). The CT scan portrayed no evidence of acute cervical spine injury.  (Tr. 1945, 1950).

On February 8, 2020, Riverview Regional Medical Center ("Riverview") reported that Horton exhibited a normal range of motion in her neck, and a CT scan of her

cervical spine displayed mild degenerative disc disease at C5-C6.  (Tr. 2257-58, 2260).

Horton received an acute cervical strain diagnosis and a prednisone prescription.  (Tr.

2259).  On February 17, 2020, Riverview's records show that Horton's musculoskeletal

system exhibited a normal range of motion and no tenderness.  (Tr. 2264).  Horton

received permission to return to work on February 19, 2020. (Tr. 2266).  On February

27, 2020, Riverview chronicled that Horton's musculoskeletal system exhibited a

normal range of motion.  (Tr. 2269).  Horton received permission to return to work on

February 29, 2020.  (Tr. 2273).

From July 14, 2020, to December 10, 2020, Health Services Center ("Health

Services") found that Horton did not report suffering any muscle aches, and she

exhibited a normal gait and normal strength in her lower extremities.  (Tr. 2196, 2199,

2212).  On March 25, 2021, Health Services commented that Horton denied the

presence of pain in her musculoskeletal system.  (Tr. 2300, 2303).

In summary, the ALJ articulated good cause for assigning little weight to Dr.

Tariq's assessment, and substantial evidence supports the ALJ's decision.

*Dr. Nichols*

Horton contends the ALJ improperly considered the opinion of June Nichols,

M.D., an examining psychologist, by according it little weight.  The previous review of

Horton's mental health records reveal the ALJ did not err in this regard.

On February 20, 2020, Dr. Nichols completed an Independent Medical

Evaluation and a Mental Health Source Statement.  (Tr. 2125-32).  Dr. Nichols opined

Horton could understand, remember, or carry out very short and simple instructions. (Tr. 2125). However, Dr. Nichols opined Horton could not maintain attention, concentration, and/or pace for periods of at least two hours, perform activities within a schedule and be punctual within customary tolerances, sustain an ordinary routine without special supervision, adjust to routine and infrequent work changes, interact with supervisors and/or co-workers, or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*). Dr. Nichols further commented that in addition to normal workday breaks, Horton would be off task 20% of the time in an 8-hour day, and she would expect Horton to miss 10-12 days of work in a 30-day period due to her psychological symptoms. (*Id.*).

The ALJ accorded little weight to Dr. Nichols's opinion as the record evidence demonstrated Horton "has largely normal mental status examinations, and the treating records show her depression and anxiety are controlled with treatment . . . ." (Tr. 812). The previous review of Horton's mental health treatment reveals substantial evidence supports the ALJ's finding. With a few exceptions, multiple mental examinations revealed Horton displayed normal speech, a euthymic mood, an appropriate affect, and normal memory, attention, judgment, thought process, thought content and intelligence. (Tr. 1737, 1740-41, 1935, 1958-59, 2130-31, 2133-34, 2137-38, 2145-46, 2147, 2150-51, 2250-51). Horton also reported her medication helped ease her symptoms. (Tr. 2138).

In summary, substantial evidence supports the ALJ's decision to accord little weight to Dr. Nichols's assessment.

*Dr. Ripka*

Horton contends the ALJ improperly considered the opinion of Jay Ripka, M.D., an examining physician, by according it little weight. The ALJ did not err in this regard.

On June 8, 2015, Dr. Ripka completed a Physical Capacities form and performed a medical evaluation on Horton at the request of Horton's counsel. (Tr. 2245-2249). Dr. Ripka opined Horton could sit upright for less than 30 minutes at a time, stand for two hours at a time, walk for less than 15 minutes at a time, and would expect Horton to lay down, sleep, or sit with her legs propped at waist level or above for three hours in an eight-hour workday.

In reviewing Dr. Ripka's assessment, the ALJ stated,

> The undersigned has considered the opinion of Dr. Jay Ripka, who performed a physical examination of the claimant at the request of her representative, and finds it to be of little weight; the claimant's records show that the claimant has largely normal physical examinations except for some muscle spasm and some reduced range of motion in the cervical spine (Exhibits 43F and 44F). Dr. Ripka's own examination was largely normal and he noted he needed nerve conduction studies in order to assess any possible spinal cord injury as the examination was largely normal (Exhibit 44F).

(Tr. 812-13).

Substantial evidence supports the ALJ's accordance of little weight to Dr. Ripka's assessment because it contradicted not only his own physical examination, but other doctors' objective physical examinations. While conducting a physical examination of

Horton's neck, Dr. Ripka noted she "was able to rotate [her] head 45 degrees both right and left," her "[f]lexion and extension appeared to be normal," and her "[l]ateral flexion was 20 degress both right and left." (Tr. 2248). Dr. Ripka also did not detect any masses or nodes in Horton's neck. (*Id.*). Horton appeared to manifest good strength "in both flexion and extension of the knees," a normal range of motion, a normal straight leg raising test, and no swelling in her knee. (*Id.*). Most pertinent, Dr. Ripka commented he "was unable to find any objective evaluation of the spinal cord," and could not follow "the progression of the possible spinal cord injury without electrical testing." (Tr. 2249).

Furthermore, as previously reviewed Horton underwent conservative treatment for her mild/moderate degenerative disc disease, cervicalgia, and lumbago. (Tr. 649, 653, 655, 658, 660, 1816, 1820, 2259). In addition, the record portrays Horton's physical examinations generally portrayed normal musculoskeletal and neurological findings, despite depicting muscle spasms or a reduced range of motion in some instances. (Tr. 555-56, 649, 653, 655, 658, 660, 668, 1813, 1816, 1820, 1923-24, 1926, 1933, 1945, 1950, 2196, 2199, 2212, 2248, 2257-59, 2260, 2264, 2266, 2269, 2273, 2300).

Thus, substantial evidence supports the ALJ's decision to assign little weight to Dr. Ripka's assessment.

*Dr. Iyer*

Horton contends the ALJ improperly considered the opinion of Anand Iyer, M.D., an examining physician, by according it partial weight.  The ALJ did not err in this regard.

On August 31, 2013, Dr. Iyer conducted a medical examination of Horton at the request of the Commissioner.  (Tr. 554).  As reviewed previously, Dr. Iyer opined Horton portrayed no difficulty getting on and off an exam table, a positive straight leg raising test, a normal gait, no need for an ambulatory assistive device, heel and toe walk, squat, and a full range of motion in her shoulders, back, hips, and knees.  (Tr. 555).  Dr. Iyer further commented that Horton's neck tested at "20 degrees flexion, 30 degrees extension, 20 degrees right and left lateral flexion, and 30 degrees right and left rotation."  (*Id.*).  Dr. Iyer concluded Horton "does not have significant limitation of functions involving: sitting, hearing, walking, standing, handling, and speaking," yet she "may have some impairment of functions involving: turning head, standing, bending, lifting, twisting, and carrying."  (Tr. 555).

The ALJ found Dr. Iyer's opinion "to be of partial weight":

Dr. Iyer opined the claimant may have some impairment of function involving turning her head, standing, bending, twisting, and carrying with no significant limitation of function with sitting, hearing, standing, walking, handling, and speaking (Exhibit 6F). His opinion is generally consistent with her consistently normal physical examination findings apart from some muscle spasm and reduced range of motion in the neck and with his own findings, but it is vague and does not specifically define what "some limitation" means.

33

(Tr. 812).

The ALJ sufficiently assessed Dr. Iyer's opinion as warranting partial weight. Dr. Iyer broadly opined that Horton may have "some limitations" without any further explanation or precision. As the Eleventh Circuit provides in a substantially similar context, "[i]f a treating physician is unsure of the accuracy of his findings and statements, there is certainly no legal obligation for the ALJ to defer to the treating physician's report." *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Moreover, as reviewed previously, the record portrays Horton's physical examinations generally exhibited normal musculoskeletal and neurological findings, despite the presence of muscle spasms or a reduced range of motion in some instances. (Tr. 555-56, 649, 653, 655, 658, 660, 668, 1813, 1816, 1820, 1923-24, 1926, 1933, 1945, 1950, 2196, 2199, 2212, 2248, 2257-59, 2260, 2264, 2266, 2269, 2273, 2300).

Therefore, substantial evidence supports the ALJ's decision to assign partial weight to Dr. Iyer's assessment.

## CONCLUSION

Based on the foregoing analysis, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate order in conformity with this Memorandum Opinion.

**DONE** this 31st day of March, 2023.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE